The next argued case is number 20-2106, ADAPT Pharma Operations v. Teva Pharmaceuticals USA. Ms. Stetson. Thank you, Your Honors, and may it please the Court. My name is Kate Stetson. I represent the appellants Opium and ADAPT. The District Court committed three errors in this case. The first was that it failed to identify the motivation to select and combine the specific elements of ADAPT's invention out of what were millions of options. Error number two, it did not apply this Court's teach-away test. Instead, it offered reasons why a person of skill in the art might have chosen to ignore a clear teach-away. And error number three, the Court impermissibly put the burden on ADAPT to overcome its premature obviousness conclusion with objective considerations. Any one of these errors warrants reversal, but I'd like to start today by discussing the teach-away. The closest prior art in this case, and the only reference reporting any stability testing of a formulation relevant to this case, is the WISE patent. Everyone agrees with both of those principles. Closest prior art, only stability testing. That patent, WISE, expressly criticized the benzalkonium chloride, BZK, that was used in this formulation, finding it not acceptable because it degraded the active ingredient, naloxone. Ms. Stetson, this is Judge Probst. What was the concentration of BZK in WISE? The concentration of BZK in WISE, because it was part of a stability test, was intentionally higher than it would be used in a regular formulation. But I would point out, Judge Probst- It was half to 25 times higher than what is called for in the past, correct? Yes, I believe that's correct. Why isn't that sufficient? And this wasn't in contrast to Chemours. This was not the only prior art reference. You say this was the closest. But there were other prior art references relied on by the district court that did nothing close to teach-away. They encouraged. So you've got this one case, and they're using dosages that astronomically exceed the dosage in the patent. Why isn't that enough to kind of question why this would be the kind of teach-away case that our previous precedent has endorsed? So, Judge Probst, let me give a two-part answer to that two-part question, if I can. First, with respect to the concentration, WISE didn't say that BZK is not acceptable at this concentration. He said BZK is unacceptable full stop. So, reasoning, as the district court did, that maybe a POSA would be motivated to use a lower concentration of BZK in the face of an express warning that says this is not acceptable because it degrades the long-form. I was just going to ask, when we look at teaching away, it's supposed to be whether it teaches away from the claimed invention, right? Yes. And that's my first question. That's my first reason for why your answer doesn't really resonate with me, which is that the claimed invention, again, is at a much lower concentration. And then second, even where WISE says don't use BZK or something, don't you think a POSA has to read that in the context of what is actually tested in WISE? I think that not only does a POSA have to read that in the context of what was tested, but so did the PTAB. And as we pointed out in our brief, the PTAB, using the right legal teach-away standard, had no dispute that the WISE patent taught away. In fact, what it said was a POSA would have given significant weight, and I'm quoting now, to the only naloxone formulation stability data disclosed in WISE. That PTAB, of course, had exactly the same thing in front of it. It had the WISE patent. It had the concentration. Well, Ms. Benson, this is Judge Proust. I appreciate what you're saying, but what we've got in front of us is a district court opinion. And you would agree, would you not, that the standard of review is clear error? I agree with it. If you have a standard of review where the district court concluded that the most you learn from WISE is not to use such an extremely high concentration of BZK, why is there sufficient basis to say clear error? Judge Proust, I don't agree. I think the general standard of review of district court findings of fact is clear error. And that's actually in contrast, of course, to the PTAB, where the challenger actually has a more accommodating standard of review. But with respect to this particular conclusion, the problem that we have is not a clear error problem. It's that this district court, in its first patent trial, didn't even cite, much less apply, the teach-away standard. Instead, it went kind of searching for reasons why that teach-away maybe wouldn't teach away. To the earlier question, it said, well, maybe there's a higher concentration. Maybe someone could infer from other prior art that you could reach a different result. But that brings me back to the second part of Judge Stoll's earlier question, I believe, and that has to do with the prior art. No one disputes, I will say it again, that WISE is the closest prior art. No one disputes that WISE is the only prior art containing stability data. And very important for this argument, no one disputes that WISE is also the most recent prior art. Can I ask you a question? This is Judge Stoll. First of all, when we look at teaching away, again, we're looking at how a person of ordinary skill in the art would read the reference. I mean, here, I understood the district court not to just be looking for reasons to distinguish WISE, but instead heard some very thorough and somewhat compelling expert testimony explaining how a poser would read WISE and say that a poser would, in fact, have to read WISE to just be saying that it would not be good to use BZK at these levels of concentration. So why couldn't the district court rely on that expert testimony putting the WISE statements in the context of the testing that was actually done in WISE? Because I think the expert, Judge Stoll, was drawn into the same mistake that the district court made. The expert testimony on this about the concentration maybe not dissuading a poser from trying BZK, about an earlier reference containing no data, maybe giving a poser the reason to infer that something was stable, all of those things, again, are resisting the teach-away. The teach-away in WISE, the most recent, closest prior art, and the prior art that the PTAB said with no dispute, teaches away from this patent. WISE says, and this is not one of those cases, I should add, where there's a question. Does the PTAB rule statement of a teach-away, which is a factual determination, is that somehow binding on the district court or on us? No, it's not. The reason I keep pressing on it, though, is because I think it is the most, the sharpest example of why the departure from the legal standard actually matters. Okay, let me ask you another question, which is, my understanding is that WISE was first published after the invention date of the Naloxone patent. Am I wrong about that? WISE was filed prior to the publication date, and there's actually no dispute here, including TEVA, that WISE is prior art. WISE talks in its brief about, TEVA talks in its brief about WISE. I'm just thinking about how a person would have read WISE or known of WISE. Would a person have known of WISE at the time of the invention? That argument, first of all, doesn't square with the statute. The statute says that prior art is whatever is filed. And, you know, what you look at is the date of filing, not whether a particular person, of course, because that's not what you're looking at when you talk about APOSA, whether a particular person would have grasped this particular filing. WISE teaches away, full stop. That's what the PTAB said, and the district court went out looking for reasons why it didn't. The other impact of… Can I ask you about that? This is Judge Prost, because the suggestion is sort of like, you know, that they went for reasons not to follow the law. I mean, is there an argument you rejected? You understand clear error applies, but you say it doesn't apply here. And I guess that suggests that you say there was some clear, there was some error of law. Where are you finding that in the district court opinion? Did they misstate what our cases say about the standard for teaching away? This is, I know it's a long opinion. It's like 90 pages, chock full of enormous number of fact findings. Can you point to us what the district court said that you think is sort of the legal, by making a, you know, a legal statement that's not correct? I can, Judge Prost. Okay. And it's the fact that within those 90 pages, the district court never once cites the teach away standard, never once cites… This is a discussion of teaching away. When they're applying the standard, presumably they're, at least inherently, saying what the standard is. You're saying it didn't say anything wrong, but because it didn't say what you think is right, that's clear error? No, Judge Prost, I apologize for stepping on your question there. The answer is it's an error of law because the district court didn't even cite or apply the right legal standard. The standard, of course, that asks, does a reference criticize or discourage or discredit something that's claimed in the patent? If you look at Appendix 65 to 66, this is the part where the district court talks about the teach away. You won't find the standard there. You won't find a cite there. What you find is the district court, again, bringing on this evidence from the expert that talks about reasons why a POSA would have ignored the teach away. That is the legal error we are claiming here. It is not an error in fact finding. It is a significant omission, and it doesn't matter what the volume of the decision is in terms of pages and facts. It's what's missing that matters. Counsel, this is Judge Stoll. You told us to look at pages 65 to 66 for the district court's statement on teaching away. But what about page 87 to 88 to 89? I think actually 87 to 88 is where the teaching away analysis is, where the legal standard is discussed. I was just wondering if you had looked at that. I have indeed, yes. The issue is that the court at that point cites one teach away case, but he doesn't square the facts that he's already found with what that teach away case says he has to do. That's the problem. Again, this was new to him, so it's not a surprise and this does happen. But that is the problem. It's what's not in the district court's opinion rather than what is. Let me speak briefly if I could to the other two issues since we've taken up some time on teach away. Motivation to combine. I want to take 30 seconds and walk through for this court the reasons why Teva's main cases are in a posit here, because I think they shine a helpful light on the motivation to combine issue. In reapplied materials involved a polishing pad. The issue was depth and width and pitch of the polishing pad. All anybody had to do was simply fiddle with those dials. DuPont was an oxidation reaction, temperature plus pressure. Galderma, inactive ingredients were all conceitedly obvious. The only question was range. Merck, this is the case on which Teva most relies. The prior art disclosed 1,200 combinations, Teva says. Every single one of those combinations was proclaimed in the prior art to be effective. So all of those combinations were effective. Here, in contrast, what you have is a vast multiplicity of combinations and options. And the problem, again, with the district court's decision, and you can find this at 56 to 58, is that the district court hones in on exactly the elements that are used in this patent, not all of the other ones that were available in the prior art. And finally, briefly, on objective indicia, there's really no question that the district court applied the wrong legal standard. It did that because Teva asked it to. And once it did, it made a number of clearly erroneous factual findings. What is that wrong standard? What is the standard that you think that they applied and that was wrong? Certainly, Judge Prossen, I think that was Judge Prossen. Forgive me. I know I'm running out of time. I guess the main thing is the district court considered the secondary considerations and analyzed them in an enormous amount of detail before it reached its ultimate conclusion of law that the patent was obvious, right? So I don't see where the error is. That is not correct. If you look at Appendix 59, the court concluded before even getting into the objective indicia that the patents are rendered obvious by the prior art, full stop. That is exactly the error that this court called out in Recyclobenzaprine. So with respect to when the court made its obviousness finding, this is what the court talked about at length in that case, the district court found something obvious, put the burden on ADAPT, Appendix 67, to show any secondary considerations of non-obviousness sufficient to overcome the prima facie case. So whatever happened after that, it was through the lens of the district court already having made that finding. That's the problem. But with respect to even... Well, I know you're familiar with KSR. There are two references to KSR on secondary considerations. One of them is neither here nor there. But when they talk about later, at the end when they talk about, they say, finally, we conclude that the patent owner in this case has shown no secondary factors to dislodge the determination that the claims are obvious. Doesn't that sound exactly like what you're saying the district court said? The district court found a prima facie case of obviousness and then said the secondary considerations do not dislodge that prima facie determination. Is that an error? Is that a legal error? What this court did, though, was to make a determination of obviousness. So this court pointed out in psychographic... What you pointed us to... I'm sorry to keep interrupting, but time is short. What you pointed us to occurs in the district court's analysis of the facts. It's under the facts heading, fact-finding, not in the conclusion of law, which certainly comes after, in the fact-finding, their detailed analysis of secondary consideration. Right? Judge Prost, the issue that we have is that Teva invited and the judge accepted the invitation to find obviousness before discussing those objective considerations. And with respect to KSR, I'd again refer you to cyclobenzaprine. There is a discussion in that case about how some courts talk about a rebuttal of a prima facie case and that that is a dangerous way to talk about this because the burden never moves. But are there not cases before and after NRA cyclobenzaprine, are cases that use the terminology prima facie case and then go to secondary consideration to see whether they've been dislodged or rebutted or et cetera, aren't there cases, are cases preceding and following NRA cyclobenzaprine that use that terminology? I think there are cases that both precede and follow it. And so I think NRA cyclobenzaprine did not, you know, adequately maybe sweep up some of the language that gets used. The important thing is the shifting of the burden, not so much the language that's used. And the other thing that I would mention here very briefly is that even if we're in clear error land, I would urge the court to look, for example, at the finding of no long-felt need, which is clearly error given the FDA's announcement. Unexpected results, clearly error in light of OREXO, this court's case from 2018 involving improvement in bioavailability. Skepticism, clear error in light of all of the testimony that no one was using doses above 2 milligrams and copying clear error in light of all of the other companies that copied this formulation right after ADAPT filed for it. So I apologize for going long. I thank you for your attention. Okay. Thank you. Let's have your rebuttal time. And let's hear from Mr. Rosendahl. Thank you, Judge Newman. May it please the court. At trial, this case was a classic battle of the experts. And ADAPT lost it, fair and square. In an uncommonly thorough 97-page opinion, the district court resolved in Tevis' favor the key factual disputes underlying the three issues on appeal, namely the motivation to combine prior art references with a reasonable expectation of success, the use of benzalkonium chloride with naloxone, and the secondary considerations of non-obviousness. Naturally, on appeal, ADAPT claims that it is raising legal issues rather than factual ones. But how APOSA would have understood the prior art, whether APOSA would have been discouraged from using benzalkonium chloride with naloxone, and whether secondary considerations are present are all factual issues and not legal ones. The two sides' experts presented very different views of the relevant facts. And in each case, the district court found Tevis' expert to be credible and ADAPT's expert to be unpersuasive. The district court's factual findings on these issues were correct and well-supported in the record. Certainly, they are not clearly erroneous. Therefore, this court should affirm the district court's ultimate conclusion that the patents ensued are invalid due to obviousness. We spent a fair amount of time on the Teach-Away issue, and I am happy to go there directly. So we had a situation where the WISE reference has a preliminary conclusion that benzalkonium chloride, which was used, as the court observed, in an extremely high concentration, many times more than would be used in the patents ensued, and more, indeed, than had ever been used in any FDA-approved nasal spray formulation. There was a preliminary conclusion that it was not suitable. What ADAPT wants us to do is look at a single sentence in WISE which says that it's not a suitable preservative and stop and just say, OK, well, if there's a sentence in here that says it's not a suitable preservative, then APOSA would take that at face value and forever forswear using benzalkonium chloride as a preservative. But that's not a reasonable reading of the reference. At least, it's not the reading of the reference that the court credited. And if we look at what WISE actually says, it is not at all as stark a teach-away as ADAPT would have it. So we know that it's a preliminary conclusion that benzyl alcohol and paraben preservatives were acceptable, that benzalkonium chloride was not. But then later studies, we find out, and I'm reading now from appendix page 6894, if the court cares to follow along, in column 27 at line 50, later studies indicated that methylparaben and propylene glycol and glycerin had a negative impact after all. We don't know what the further studies would have shown about benzalkonium chloride because there weren't any further studies to follow up on that. If we go to column 28 and we look at the actual conclusion that WISE comes to, this is starting in about line 23, it says, Net. Applicant found that surprisingly commonly used excipients, including one or more of ascorbic acid, hyperamylose, propylene glycol 400, sorbitol, glycerin, polypropylene glycol, methylparaben, propylparaben, benzalkonium chloride, were found to increase degradation of naloxone. And then comes the key sentence. While some of the excipients might work individually, the combination of many of these was found to be unacceptable for various reasons as outlined above. And so there's just not the strong categorical clear teach-away, as a matter of fact, in here that ADAPT would like there to be. And certainly there's not a statement, there's no legal error of the district court crediting Tevez Expert's testimony that APOSA reading-wise as a whole would not be dissuaded from using benzalkonium chloride at the far lower concentrations found in the patents, found in other prior parts. I mean, I believe that the part that is actually relied on for the teach-away, maybe I'm wrong, but I thought it was more in column 27 around lines 29 to 31 would have been the sentence that they probably would have cited. So what's your response to that? Which is a sentence that says, the results further surprisingly showed that the use of, I think this is PZK, a common nasal preservative resulted in additional degradant. Am I misunderstanding? I thought this was the part of the reference that they primarily relied on. Sure. But I guess my point, Your Honor, is that that sentence has to be read in the context of the article as a, the patent as a whole. And what that says is that in formulations 7, 9, 14, and 14A, there was degradation. And because benzalkonium chloride was in there, the preliminary conclusion was that benzalkonium chloride might be contributing to the degradation. But if we go to the page before that, table 13 at the bottom of column 26, we can see the different formulations that were used. And if, first of all, if we look at, for example, formulation number 12, that has benzalkonium chloride, doesn't show any degradation. 14 and 14A are the same formulation. It's just that 14A is a more acidic version of it. But those contain glycerin and propylene glycol, which are in the list of disfavored excipients. If we go to number nine, we see polyethylene glycol and sorbitol, which are in the list of disfavored excipients. If we go to number seven, we've got hypermellose and sorbitol, which are also in the list of disfavored excipients. And tellingly, if we look at number seven and we compare it to 7M in table 14, we'll see that it's the same formulation, except that the BZK has been replaced with benzoalcohol as the preservative. And WISE tells us in column 29 at line 54, formulation 7M had markedly increased degradation. And so what that tells us is that the substitution of benzalkonium chloride for their preferred preservative, benzoalcohol, didn't actually improve the degradation problem, which suggests that other elements in the formulation are responsible for it. So I think the testimony was that a person reading that sentence from WISE in the context of the data behind it, and in the context of the other statements in WISE, and bearing in mind the extremely high concentration, might have been dissuaded from using benzalkonium chloride at high concentrations, but not at the ones that were here. And it is worth noting that the Kerr formulation and the Davies formulation both rely, which were part of the obviousness combinations, both had benzalkonium chloride in them. And Kerr was used in a clinical trial in Australia over an 18-month period with no noticeable problems due to the presence of benzalkonium chloride. And this is Judge Prost. On page 98, I'm sorry, of the district court's opinion, the district court relied on those two factors, right? One, the higher concentration, much higher than the patents ensued, and also that it was commonly used preservative that has been used in over 200 intranasal products. And it referred specifically to the Davies reference in the Kerr formulation, correct? Correct, Your Honor. Yeah. So we have an extremely popular, widely used preservative. And, you know, the question is does this one stray sentence in WISE, is that enough to cause a poster to give up on that preservative completely? And the answer that the district court found was no. So if there are no further questions on the T2A, I'm happy to touch on the other issues briefly that were. Excuse me. I'm going to pause the proceedings. It looks like Judge Newman has disconnected. Is everyone on the line? I'm here. Everyone appears to be on the line, Judge Newman, I'm sorry. Okay. Can we pick up where, if you all heard the click, where I was disconnected? Your Honor, this is J.C. Rosendahl. I'm afraid I didn't hear the click exactly. Go back a paragraph or so in what you were saying. Well, I believe we had come to the point, I think we had sort of come to closure on the teaching away issue. The point being that, I don't know if you heard Judge Prost, question to me about the district court's discussion of it. My question preceded it, and then I think I heard the buzzer go off in terms of your time. Oh, I'm sorry. I didn't hear the buzzer either. Well, then I'll try to be very fast on the other points. Finish the points you were making. So for secondary indicia, I don't think it is fair or accurate to characterize the district court's opinion as improperly shifting the burden to adapt, and we certainly didn't invite the district court to do that. I think that what we see in the district court's decision regarding description of the legal issue at page 88 and 89, the heading on page 88 is plaintiffs failed to show any secondary considerations of non-obviousness to support patentability sufficient to overcome Tevis prima facie showing of obviousness. And so I think it's quite clear that what the district court was doing was dealing with a prima facie case of obviousness and had not improperly shifted the burden to the other side to disprove obviousness. On the substance of the secondary indicia, these are weak indicia. I think if we take, for example, industry skepticism, the skepticism that was expressed was not that anyone thought the invention would not work for its intended purpose. The skepticism was that if you use a high dose of naloxone, you might get an increased incidence of withdrawal symptoms. But, of course, that is exactly what happens. There is a higher dose in the Narcan product, and it does have a higher incidence of withdrawal symptoms. And so this is not a situation where the inventors identified a problem and then found a way to solve it. The inventors identified a problem and then decided to go ahead and bring out the product anyway. So that's not the sort of skepticism. And, indeed, the skepticism was from people like police chiefs and not from POSAs or formulators. So it's just a very weak basis. The same thing is true of the copying. Mundipharma doesn't contain the excipients that are claimed here. Evzio isn't even an intranasal product. If they were attempting to copy, these companies failed miserably. The fact that they ended up using a higher dose of naloxone doesn't rise to the level of copying because the patent doesn't cover all 4-milligram doses of naloxone. With regard to the long-felt but unmet need, it was clear from the testimony at trial that it was the failure to get FDA approval that was the basis for that argument. We know, however, that the reason why there wasn't an earlier FDA-approved product was economic and not technical. There was evidence put in by ADAPT itself that the economic case for a new naloxone product was dismal in part because of the difficulty of getting patent protection. And only after the FDA determined that clinical trials for efficacy and safety would not be needed and that a simpler approval process would be possible was their interest in the product. And then as soon as that decision was made, very quickly products came to the market. So I think if we look at the totality of the district court's opinion, which was carefully reasoned and contains an awful lot of detailed fact-finding, there's plenty of evidence to support the finding of non-obviousness. And although ADAPT has tried to dress up its arguments in legal garb, the factual findings carry the day here. If the court has no further questions, I will conclude.  Any more questions for Mr. Rosendahl? Okay. Then, Ms. Stetson, you have your rebuttal time. Thank you, Judge Newman. I want to make a few quick points on what Mr. Rosendahl said and didn't say. The first is, when Mr. Rosendahl was offering his complex explanation about why a POSA might not have read WISE at face value, what he said was a POSA wouldn't give up on using BZK. That, of course, is our point. That's not the legal standard. The standard is, did WISE teach away? And as the PTAB specifically held, it did. The fact that this district court found older, non-data-supported references to trump that was a legal error, not a factual error. Second, on motivation to combine, I, again, would urge the court to review the cases that TEVA cite, because none of them involve the kind of multiplicity of compounds here. A couple points on that. Appendix 57, the court talks about the pH-adjusting agent, and the court says a POSA would have used hydrochloric acid. But there are at least three pH-adjusting agents, so why hydrochloric acid? Appendix 58, a POSA would have used sodium chloride because it was a known tonicity agent. There were several tonicity agents to choose from. Why sodium chloride? Appendix 59, BZK is commonly used as a preservative. There are five different preservatives disclosed in the prior arc. Why BZK, particularly in light of WISE? Third and final point. Counsel, this is Judge Stoll. I just want to point out that you didn't make these points in your opening argument, and therefore Mr. Rosenthal did not get to address them. Now, I would have liked to have heard his response if you were going to make these points. Judge Stoll, I apologize. I did make the point in the opening argument right at the beginning. You didn't talk about motivation. You really talked about teaching away. You didn't talk about these specific points. Next time, I suggest that if you want to make an argument, that you make it in your opening and don't wait until the end when opposing counsel has no opportunity to respond. Understood, Judge Stoll. As I said in my opening, I would encourage, with respect to motivation to combine, the court to look at the key cases in Teva's brief because I think in the end you will conclude, as I mentioned earlier, that those key cases help us and not Teva. With respect, finally, to the burden shifting, Teva is wrong. Mr. Rosenthal is wrong that he did not invite the error. What Appendix 5292 says is that ADAPT bears the burden of proof on its assertions of secondary indicia, and this was not just a one-off error. The court at Appendix 90, 91, 92, 95, every time said ADAPT failed to establish, ADAPT failed to carry its burden. That is the failure with respect to objective considerations. But again, in the end, what we will come back to is that shortest path to reversal here is that plain teach-away. Mr. Rosenthal took the first few minutes of his argument today attempting to explain his way out of the teach-away. That's what the expert tried to do again below. It's what the court did below. But you can't explain your way out of a teach-away, why someone wouldn't nevertheless be deterred. This teach-away, as the PTAB found says, says this is unacceptable. Full stop. That should be the most straightforward path to reversal for this court if there are no further questions. Any more questions? All right, thank you. Thanks to counsel for both sides. The case is taken under submission. And that concludes this panel's argument schedule for this morning.